# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DANNY LAMONT CHAMBERS; and DONTELL RAYVON-EDDIE SMITH,

    *Plaintiff*.

v.

RONALD SANDERS, individually and in his official capacity as a public safety officer; and CITY OF DETROIT, a municipal corporation,

    *Defendants*.

Case No.

Hon.

_____/

*There currently exists a related case. <u>Danny Burton v Sanders et al, case number 2:20-cv-11948</u>, currently pending in this court before Hon. Paul D. Borman, involves the same wrongful conviction and wrongful incarceration that is at the heart of this action.*

## COMPLAINT AND JURY DEMAND

NOW COME the Plaintiffs, DANNY LAMONT CHAMBERS and DONTELL RAYVON-EDDIE SMITH, by and through their attorneys, JOHNSON LAW PLC, and file their Complaint against the Defendants in this civil action, stating as follows:

## JURISDICTION AND VENUE

1. This is an action for damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, against Defendants, RONALD SANDERS, in his

individual capacity, and in his official capacity as a law enforcement officer, and CITY OF DETROIT, a municipal corporation.

2.  This Court has original jurisdiction over Plaintiffs' claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.  The defendants' unlawful actions alleged in this Complaint took place within the jurisdiction of the United States District Court for the Eastern District of Michigan.

4.  Venue is appropriate in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) and based on the situs of the incident, which occurred in the City of Detroit, County of Wayne, State of Michigan.

5.  At all pertinent times Plaintiffs, DANNY LAMONT CHAMBERS and DONTELL RAYVON-EDDIE SMITH, were United States citizens.

6.  At all pertinent times, Defendant, RONALD SANDERS ("SANDERS"), was employed as a Detective by the DETROIT POLICE DEPARTMENT ("DPD"), a department of the CITY OF DETROIT ("DETROIT"), and was acting under color of law.

7.  At all pertinent times, DETROIT was a municipal corporation formed under the laws of the State of Michigan, and through its Police Department ("DPD"), was the employer of SANDERS.

8.  All complained of actions of defendants were done intentionally, purposely, purposefully, wantonly, willfully, sadistically, callously, recklessly,

deliberately, maliciously, knowingly, carelessly, with gross negligence, and in a manner that shocks the conscience in a constitutional sense.

## STATEMENT OF FACTS

### General Allegations

9. On September 14, 1987, after a five-day jury trial in the Wayne County Circuit Court on a charge of first-Degree Murder, MCL 750.316, and Felony Firearm, MCL 750.227(B), Danny Burton, father of Plaintiffs Danny Lamont Chambers and Dontell Rayvon-Eddie Smith, Mr. Burton, was convicted and sentenced to life in prison without the possibility of parole. Pl.'s Ex. 1.

10. The murder charge against Mr. Burton and two co-defendants arose after the body of Leonard Ruffin, with multiple gunshot wounds, was found in an alley between the streets of Philadelphia and Euclid in the City of Detroit on May 2, 1987.

11. The case against Mr. Burton was built primarily upon witness statements of individuals who resided in or were present at the home where the shooting occurred.

12. The key witnesses who testified at Mr. Burton's trial subsequently provided affidavits recanting their trial testimony and stating that they gave false statements at trial because of threats and intimidation by Defendant SANDERS.

13. On December 6, 2019, the prosecutor made a motion to vacate Mr. Burton's convictions and dismiss the criminal case against him with prejudice, which was granted by the trial court. The prosecutor's motion was

based in part on new evidence coming to light that undermined the integrity of Mr. Burton's conviction. Pl.'s Ex. 1.

### Rampant Constitutional Violations

14. In the early morning hours of May 2, 1987, Leonard "Lenny" Ruffin, a friend and associate of Mr. Burton's, was shot multiple times and subsequently died from the wounds.

15. Mr. Burton was arrested as a suspect during the investigation into this crime.

16. While in custody during the investigation, Defendant SANDERS engaged in threats, intimidation, and physical violence to pressure Mr. Burton into confessing to a crime Mr. Burton did not commit. Pl.'s Ex. 2.

17. In addition, Defendant SANDERS employed the same tactics to successfully pressure Mr. Burton into signing a waiver of constitutional rights.

18. Defendant SANDERS engaged in similar behavior to pressure another friend and associate of Mr. Burton's, Paul Young, into falsely confessing to the crime and implicating Mr. Burton. Even after Paul Young, a minor at the time, requested that his mother be present, Defendant SANDERS did not allow him to see or contact his mother. This confession was ruled inadmissible due to the means Defendant SANDERS used to obtain it. Pl.'s Ex. 3.

19. Felicia Gilchrist testified at the trial, providing incriminating testimony about events preceding the murder, seeing Mr. Burton at the scene of the crime, and witnessing the disposal of the body. This testimony was crucial to Mr. Burton's conviction, but she has since recanted this testimony in a sworn affidavit, attributing her dishonesty to the same pattern of threats, intimidation, and coercion by Defendant SANDERS. Pl.'s Ex. 4.

20. Lula Gilchrist, Felicia Gilchrist's mother and the owner of the home where Ruffin was murdered, testified to a similar, although inconsistent set of facts at the trial. Like her daughter, Lula Gilchrist has also recanted her statements and described Defendant SANDERS threats, intimidation, and coercion as the reason for her dishonesty. Pl.'s Ex. 5.

21. Andrew "Von" Williams testified at trial, albeit inconsistently, that he not only witnessed Mr. Burton at the scene of the murder, but also helped him transport the body afterward. While he has not detailed the abuses of Defendant SANDERS that led him to do so, he has since recanted his testimony in a sworn affidavit. Pl.'s Ex. 6.

22. Alfreda Jackson also testified at the trial and has since recanted this testimony in a sworn affidavit, stating that Defendant SANDERS wrote her written statement without her input, coercively obtained her signature while she was high on crack, and that her testimony at trial was based solely on what she heard from Felicia and Lula Gilchrist. Pl.'s Ex. 7.

23. Deandre Bolden, 15 years of age at the time of the incident, tried

to truthfully tell both the police and the trial Court that he didn't see the shooting. However, at the hands of Defendant SANDERS, Bolden was physically beaten, was threatened with being murdered or being charged with the murder himself and was interrogated for a whole day without his mother present and without any food or water. Further, at trial, Bolden was cut off by the prosecution and not allowed to give truthful testimony because it conflicted with his prior, coerced testimony. Deandre Bolden has since recanted his incriminating testimony. Pl.'s Ex. 8.

24. Clara Hill Williams, a minor at the time of the trial, stated in a sworn interview that Detroit Police officers abused her, kept her in a room for hours without letting her go to the bathroom and forced her to sign a statement that she did not make. The officer also kept her in a room over night to stop her from testifying at trial, knowing that she would contradict the prosecution's theory of the case. She stated she would have testified that Mr. Burton did not commit the crime. Pl.'s Ex. 9.

25. Moreover, upon information and belief, Defendant SANDERS engaged in this unconstitutional action, attempting to ensure that Mr. Burton was convicted, despite knowing not only that Mr. Burton was innocent, but also knowing who the real murderer was. Pl.'s Ex. 10.

26. As a direct and proximate result of the wrongful acts and omissions of Defendant SANDERS and DETROIT, Plaintiffs sustained damages, specifically having their father wrongfully torn away from them for over 32 years

and forced to endure the pain and humiliation of having their father labeled a murderer.

27. Defendant SANDERS, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: "As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."

28. Defendant SANDERS, knowing that overwhelming exculpatory evidence existed before Mr. Burton's criminal trial, conspired with DPD officers and/or prosecutor(s) to suppress the exculpatory evidence and ensure that Mr. Burton, an innocent man, was sentenced to life in prison without parole.

29. Defendant SANDERS, an experienced, well-trained police officer who took an oath to protect citizens' constitutional rights, conspired to knowingly deprive Mr. Burton of his constitutional rights under the 4th Amendment, and to thereby deprive Plaintiffs of their constitutional right to be with their father, a right which is enshrined in the Due Process Clause of the Constitution which guarantees protection to the family unit.

30. Defendants SANDERS and DETROIT knew their decision to suppress exculpatory evidence from Mr. Burton ran afoul to the United States Supreme Court's recognition of the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go

free." In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

31. Defendants targeted Mr. Burton, and his family, anyway.

32. SANDERS also made a conscious, knowing, and intentional choice not to reveal exculpatory evidence to Mr. Burton.

33. Defendant SANDERS either did not bring the exculpatory evidence to the prosecutor's attention, or SANDERS conspired with prosecutors to suppress the evidence from Mr. Burton.

34. Since Defendant SANDERS knew that the written statements he took from the witnesses were false representations of their statements to him, and that the statements the witnesses actually made to him definitively supported that Mr. Burton was an innocent man, SANDERS made a conscious, knowing, and intentional and/or reckless choice to ensure the witnesses true statements were not disclosed to Mr. Burton before his trial.

35. But for Defendants' conduct, there would have been no probable cause for Mr. Burton to be charged with murder, nor a conviction.

36. As a result of Defendants' conduct, Mr. Burton spent **32 years and 83 days** wrongfully imprisoned, away from his children and his family, for a crime he did not commit.

**Detroit's Customs and Policies that Caused Mr. Burton's False Conviction**

37. On and before September 14, 1987, the date Mr. Burton was charged with first degree murder, Defendant DETROIT, by and through its policymakers,

had a custom and policy to authorize, condone, tolerate and approve illegal and unconstitutional actions by Defendant Detroit, its command staff, and its officers, including but not limited to Defendant SANDERS.

38. The illegal and unconstitutional actions and practices included but were not limited to:

   a. Conducting inadequate investigations into serious felony cases, such as murder, in order to expeditiously close cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

   b. Knowingly and deliberately suppressing and/or fabricating evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

   c. Knowingly and deliberately choosing not to conduct formal tests and identification procedures because investigators knew that the results would contradict evidence against their target suspects;

   d. Detaining and intimidating witnesses until the witnesses gave the police the statements that the police desired, including statements the police knew or should have known were false; and

   e. Rounding up witnesses, not suspects, and locking them up for days at a time on the ninth floor of DPD Headquarters at 1300 Beaubien, in an attempt to pressure them to give statements that incriminated the target suspects.

39. Defendant, DETROIT, through its policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to suppress evidence and to disclose apparent exculpatory and impeachment evidence.

40. DETROIT's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Mr.

Burton, and were the moving force behind Defendants DPD's and SANDERS' constitutional violations.

41. Due to the conduct of Defendants SANDERS and DETROIT, as set forth herein, Plaintiffs Danny Lamont Chambers and Dontell Rayvon-Eddie Smith, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by having their father wrongfully incarcerated and imprisoned for a period of over thirty-two years;

    b. Severe emotional distress for this time period, including, but not limited to: the emotional distress of having their father get charged with first degree murder, having their father face a sentence of life in prison with no possibility of parole; having their father get wrongfully convicted for crimes the Defendants knew he did not commit; having their father incarcerated for 32 years; and having their father labeled a murderer for over 32 years;

    c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d. Fright, shock, indignity, humiliation, outrage, indignity and embarrassment of having their father get wrongfully charged, convicted, and imprisoned for first degree murder;

    e. Loss of enjoyment of daily activities;

    f. Loss of the normal consortium children have with their fathers;

    g. Loss of a close relationships with their father; and

    h. Other damages and harm.

42. Due to the conduct of Defendants SANDERS and DETROIT, as set forth herein, the real murderer was never convicted and retained his freedom while Mr. Burton spent over 32 years in prison.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS BROUGHT PURSUANT TO 42 U.S.C. §§ 1983 AND 1988, AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

43. Plaintiffs incorporate herein all the prior allegations.

**Plaintiffs' Due Process Rights to Protection of Their Family Unit.**

49. Plaintiffs have the constitutional right to have their family unit protected by the Due Process Clause of the Constitution.

50. Plaintiffs were deprived of their rights as children of Danny Burton to have their family unit, consisting of Danny Burton and Plaintiffs, to be protected and preserved. As a direct and proximate cause resulting from defendants' unconstitutional behaviour, as outlined herein, this family unit, which is afforded constitutional protection under the Due Process clause, was shattered and destroyed by the defendants. Danny Burton was sent to prison, and plaintiffs were forced to grow up fatherless, instead watching Mr. Burton spend over 32 years in prison.

51. Plaintiffs' rights were violated when defendants violated Mr. Burton's rights, which caused Mr. Burton to be falsely convicted and imprisoned.

A. *Brady* **Violations**

44. Defendant SANDERS was under an unwavering legal duty ("*Brady*" duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, including, but not limited to, the evidence that he willingly suppressed, such as Clara Hill's and other

- 11 -

witnesses' testimony that indicated Mr. Burton was not guilty of the crime.

45. Defendant SANDERS' failure to disclose this evidence resulted in material exculpatory and impeachment evidence not being turned over to Plaintiffs' defense counsel, in violation of the Defendants' *Brady* obligations.

46. Defendant SANDERS was under a further duty to make truthful statements to the prosecutor and judge(s) to establish probable cause for an arrest warrant.

47. Defendant SANDERS was further under a duty to make truthful statements in the investigative reports he knew would go to the prosecutor to establish probable cause for an arrest warrant.

48. Defendant SANDERS violated Mr. Burton's constitutionally-protected rights, including his right to liberty protected by the Due Process clause of the Fifth Amendment, as applicable to the States via the Fourteenth Amendment to the U.S. Constitution, his right to a fair trial, guaranteed by the Sixth Amendment, as well as his right to be free from continued unlawful detention without probable cause as a result of suppressed evidence, guaranteed by the Fourth and Fourteenth Amendments, by the following conduct:

52. Defendant SANDERS deliberately and knowingly, or with reckless disregard for the truth, chose not to disclose material exculpatory and impeachment evidence in his files to the prosecutor in violation of his constitutional obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

53. Had Defendant SANDERS disclosed this evidence as required, it would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam, or an acquittal at trial.

54. Such conduct establishes a claim for a "*Brady* violation."

### B. Malicious Prosecution

55. Defendant SANDERS influenced or participated in the initiation of criminal prosecution when he presented false evidence and suppressed exculpatory evidence.

56. Moreover, Defendant Sanders deliberately and knowingly solicited false testimony from witnesses through violence and coercion.

57. Defendant Sanders further supplied this false information and/or omitted material information in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause, showing a reckless disregard for the truth.

58. Such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment.

### C. Fabrication of Evidence

59. Defendant SANDERS deliberately and knowingly presented fabricated evidence to create probable cause.

60. This included both written statements implicating Mr. Burton that Defendant SANDERS solicited through violence and coercion, or otherwise knew to be false, as well as the same statements given orally at trial.

61. This fabricated evidence was material to a finding of probable cause that Danny Burton had committed the crime, and probable cause would otherwise have been lacking.

62. This fabricated evidence was also material to a finding at trial of guilt beyond a reasonable doubt that Danny Burton had committed the crime, and this burden would otherwise not have been satisfied.

63. Such conduct constitutes a claim of "fabrication of evidence" under the Fourth Amendment.

### D. **Detroit's *Monell* Liability**

64. Defendant, DETROIT, created policies, practices, and customs that governed Defendants DPD and SANDERS, including a failure to provide adequate training to its police officers, including Defendant SANDERS, in the manner set forth above.

65. This demonstrated "deliberate indifference" to the constitutional rights of its citizens and was the moving force behind Defendant SANDERS' violations of Plaintiffs' constitutional rights.

66. Mr. Burton's right not to be deprived of liberty based upon fabrication of evidence by a government official acting in an investigatory capacity was clearly established before Mr. Burton's conviction in 1987.

67. Mr. Burton's right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before 1987.

68. Mr. Burton's right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing suppression of exculpatory evidence, advancement of false evidence, and false statements and/or material omissions to prosecutors and magistrate judges, guaranteed by the Fourth Amendment, was clearly established before 1987.

69. Defendant SANDERS' *Brady* violations resulted in Danny Burton not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

70. Through Defendants' numerous constitutional violations perpetrated against Mr. Burton, they also violated the constitutional rights of the plaintiffs as follows:

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

71. Plaintiffs incorporate herein all the prior allegations.

72. Defendant Sanders' herein-described intentional actions and inactions with the specific purpose of charging, prosecuting, convicting, and incarcerating an innocent man, were intentional, extreme, and outrageous.

73. When Mr. Burton was labeled a murderer, arrested, charged, prosecuted, convicted, and incarcerated, it directly and proximately caused decades of foreseeable serious emotional distress to Mr. Burton's children.

74. Plaintiffs, Mr. Burton's children, suffered severe emotional distress, caused directly and proximately from Sanders' extreme and outrageous conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, SMITH AND BURTON, demands judgment and pray for the following relief, jointly and severally, against all Defendants:

a. Full and fair compensatory damages;

b. Punitive damages;

c. Exemplary damages;

d. Reasonable attorney's fees; and

e. Any such other relief as appears just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

Respectfully submitted,

JOHNSON LAW, PLC

By: */s/ Solomon M. Radner*
Vernon Johnson (P39219)
Solomon M. Radner (P73653)
Madeline Sinkovich (P82846)
Attorneys for Plaintiffs
535 Griswold Street, Suite 2600
Detroit, MI 48226
(313) 324-8300
vjohnson@venjohnsonlaw.com
sradner@venjohnsonlaw.com
msinkovich@venjohnsonlaw.com

Dated: April 1, 2021